[Civ. No. 48667. Second Dist., Div. Two. Mar. 15, 1977.]

NORMA MONCUR et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

[Civ. No. 49316. Second Dist., Div. Two. Mar. 15, 1977.]

RHETT PATRICK SHAUGHNESSY et al.,
Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Ben F. Goldman, Jr., John J. Baer, Kenneth G. Petrulis, Gabler, Domke & Berglund and William Rehwald for Plaintiffs and Appellants.

Kirtland & Packard, Alexander B. T. Cobb and Robert E. Moore, Jr., for Defendants and Respondents.

**OPINION**

**COMPTON, J.**—On August 6, 1974, a bomb exploded at the Pan American Airlines terminal at the Los Angeles International Airport. Several persons were killed and injured. Robert Moncur was one of those persons killed and Rhett Patrick Shaughnessy was one of the injured. The heirs of Robert Moncur in case No. SW C 31766, and Shaughnessy and his wife in case No. C 120257 all instituted actions against the City of Los Angeles and the members of the airport commission (hereafter the City). The trial court in each case sustained without leave to amend a demurrer to the third amended complaint and entered judgments of dismissal. The plaintiffs noticed appeals. We have consolidated the appeals.

Both Moncur and Shaughnessy at the time of the explosion were in the common area of the Pan American terminal waiting to board a flight. The bomb had been placed in a coin-operated locker which was located in an area near the Pan American facility, an area which was completely accessible to the public.

The complaint in the two actions contained allegations of various forms of tort liability, all predicated on the failure of the City, in the operation of the airport, to take safety precautions in restricting access to the rental lockers. Both complaints charged the City with knowledge of the prevailing climate of violent activity by extremists and the fact that airplanes and airport facilities are favorite targets of these extremists.[1]

Nevertheless the issue presented is a narrow one. Accepting the factual allegations of the complaint as true as we are bound to do in assessing the sustaining of a demurrer (*Hitson* v. *Dwyer,* 61 Cal.App.2d 803 [143 P.2d 952]; *McHugh* v. *Howard,* 165 Cal.App.2d 169 [331 P.2d 674]) our attention is focused on the element of duty and causation. ■ In the latter regard we are not bound to accept plaintiff's conclusionary, ineffectual or improperly pleaded allegations. (3 Witkin, Cal. Procedure (2d ed.) Pleading, p. 2413; *Griffin* v. *County of Colusa,* 44 Cal.App.2d 915 [113 P.2d 270]; *Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732].)

---

[1]The Moncur heirs allege a generalized knowledge by the City of possible violent activity whereas the Shaughnessys allege that the City possessed a specific knowledge as a result of a telephone call prior to the explosion announcing that a bomb had been placed "somewhere in the airport." In this latter connection we take note of the vast size of the Los Angeles International Airport and also the fact that it is common knowledge that a large number of crank phone calls and bomb threats are received by public agencies throughout the year.

Central to the complaint in both cases is the theme that public lockers afford a convenient place of concealment for anyone disposed to plant an explosive device in the airport terminal; that their location in this case in an area of easy accessibility constituted a dangerous condition of the airport property—a condition which could have been eliminated, as the City well knew, by relocating the existing search and surveillance system which is used to screen persons boarding airplanes.

■ An essential element of tort liability is the existence of a legal duty owed to the plaintiff which duty has been breached by the defendant either intentionally or negligently. (4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 5, p. 2306.) The legal duty in the case of government tort liability is governed by statutory provisions which provide for immunity for certain governmental acts necessary to operation of government. (Gov. Code, § 815; *Susman* v. *City of Los Angeles,* 269 Cal.App.2d 803, 808 [75 Cal.Rptr. 240].)

■ Government Code section 845 provides: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service."[2]

To the extent that plaintiffs' complaints may be construed as alleging a failure to provide sufficient police protection in the form of patrols or police surveillance of the common areas of the terminal, they fail to state a cause of action. (*Susman* v. *City of Los Angeles, supra; Antique Arts Corp.* v. *City of Torrance,* 39 Cal.App.3d 588 [114 Cal.Rptr. 332]; *Hartzler* v. *City of San Jose,* 46 Cal.App.3d 6 [120 Cal.Rptr. 5]; also see Gov. Code, § 818.2.)

In an effort to escape the immunity provisions of Government Code section 845, plaintiffs maintain that the complaints in no way allege that the City had failed to provide adequate police protection but rather that the complaints specifically addressed themselves to maintenance of a dangerous condition on public property.

[2]The Law Revision Commission comment to section 845 states: "This section grants a general immunity for failure to provide police protection or for failure to provide enough police protection. Whether police protection should be provided at all, and the extent to which it should be provided, are political decisions which are committed to the policy-making officials of government. To permit review of these decisions by judges and juries would remove the ultimate decision-making authority from those politically responsible for making the decisions."

■ A public entity is liable for injury caused by a dangerous condition of its property if (1) the property was in a dangerous condition at the time of the injury; (2) the dangerous condition caused the injury; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred; and (4) that either (a) a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the condition, or (b) the public entity had actual or constructive notice of the dangerous condition in time to have taken measures to protect against the dangerous condition. (Gov. Code, § 835; *Sykes* v. *County of Marin,* 43 Cal.App.3d 158 [117 Cal.Rptr. 466]; *Vedder* v. *County of Imperial,* 36 Cal.App.3d 654, 659 [111 Cal.Rptr. 728].)

Section 830 of the Government Code states: " 'Dangerous condition' means a condition of property that creates a substantial . . . risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used." Case law has interpreted that section to apply to the physical condition of the property itself. (*Sykes* v. *County of Marin, supra; Campbell* v. *City of Santa Monica,* 51 Cal.App.2d 626 [125 P.2d 561]; *Shipley* v. *City of Arroyo Grande,* 92 Cal.App.2d 748 [208 P.2d 51]; *Bryant* v. *County of Monterey,* 125 Cal.App.2d 470 [270 P.2d 897].)

Liability for injury caused by dangerous condition of property has also been imposed when an unreasonable risk of harm is created by a combination of defect of property and acts of third parties. (*Baldwin* v. *State of California,* 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121]; *Quelvog* v. *City of Long Beach,* 6 Cal.App.3d 584, 591 [86 Cal.Rptr. 127].) However, the courts have consistently refused to characterize harmful conduct on the part of a third party as a dangerous condition in the absence of some concurrent contributing defect in the property itself. (*Hayes* v. *State of California,* 11 Cal.3d 469, 472 [113 Cal.Rptr. 599, 521 P.2d 855], citing *Jones* v. *Czapkay,* 182 Cal.App.2d 192 [6 Cal.Rptr. 182].)

Plaintiffs urge on us the recent holding in *Slapin* v. *Los Angeles International Airport,* 65 Cal.App.3d 484 [135 Cal.Rptr. 296] in support of their position.

In *Slapin* plaintiff was assaulted and injured at night in a parking lot at the Los Angeles International Airport. Plaintiff's action against the City was based on the theory that inadequate lighting was a dangerous condition which created a substantial risk of the occurrence of such criminal conduct.

This court in overruling a judgment of dismissal entered after the trial court had sustained a demurrer without leave to amend held that plaintiff had stated a cause of action and could prevail at trial upon proof that the lighting of the parking lot was a concurrent proximate cause of the injury.

The *Slapin* court reiterated the proposition that the City could not be held liable for failure to police the parking lot and the opinion expressed considerable doubt that plaintiff could ever prove that the lighting was a "cause" of the injury. Be that as it may *Slapin,* as distinguished from the case at bench, did involve an alleged defect in the condition of the property, to wit, the lights.

In the instant case the airport building was not itself a dangerous or defective piece of public property. The danger was created by the act of placing the bomb on the property. The bomb was unrelated to the physical condition of the terminal and could not in any sense constitute a defect in something of which it was not a constituent part.

The physical condition of the locker was not defective in any sense. Plaintiffs' theory is that the location of the locker created the dangerous condition. The location, of course, was not per se dangerous, but plaintiffs' theory is that the location was dangerous because it was not within the security perimeter. That adds up to saying that the locker constituted a dangerous condition because the City did not search persons who used them.

If there is a common factor that exists in the varied acts of terrorism which appears to be increasing in frequency it is the dogged but irrational determination of the perpetrators.[3] There is a myriad of possibilities which can be readily suggested as to how a determined bomber could introduce an explosive into an airport. There are toilet facilities and trash receptacles which provide obvious places for such activity. In fact, an ordinary piece of luggage sitting unattended next to a bench in an airport terminal would attract little notice.

[3]One Muharem Kurbegovic who allegedly was the perpetrator here was indicted by the Los Angeles Grand Jury on September 25, 1974. He has yet to be tried because of a finding that he was incompetent to stand trial. (*People* v. *Kurbegovic* (Cal.App.) hg. granted by Supreme Ct. and appeal dism. as moot by operation of Pen. Code, § 1370, subd. (b)(2).).

How then can it ever be said that the availability of a rental locker outside of the security screen was the "cause" of a bomb being exploded in the terminal? How can it be said that "but for" the presence of the unsecured locker, the bomber would not have done his dastardly deed?

That a locker happened to meet the peculiar requirements of the bomber in this particular case is not enough even by maximum use of hindsight to turn the locker into a dangerous condition of the property.

Furthermore, although one may be able to foresee the likelihood of aberrant behavior in these turbulent times and perhaps divine with reasonable success the general behavioral form which it will take, the precise means which a deranged person or a fanatic will employ is based upon too many variables for accurate prediction. (See Livermore, Malmquist, and Meehl, *On the Justifications of Civil Commitment,* ·117 U.Pa.L.Rev. 75, at p. 82.)

In brief, while it is known that fanatics and lunatics can be harmful to others, their devices and stratagems are as diverse as ·the variety of mental ills or compulsive radicalism which prompt their behavior. To follow plaintiffs' argument to its logical extreme the City would have to place a security screen at least at the doors of the entire terminal or more likely at the point of vehicular access to the entire grounds.

■ The security measures which the City had instituted, and which plaintiff contends should be expanded, were in response to the requirements of regulations promulgated under the authority of the Federal Aviation Act of 1958. (49 U.S.C. § 1432(b).) The regulations require airport operators to adopt procedures to prevent unauthorized access to "air operations areas" of an airport. That area is defined as the area used for "takeoff, landing or surface maneuvering of aircraft." The regulations do not require security measures to screen all persons entering all parts of an airport facility. (See 37 Fed. Reg. 5690; 14 C.F.R. § 107.1 et seq.)

We need not dwell at length on the vexing but now fairly settled problem of interference with private rights which our California Supreme Court found in airport searches and seizures. Our court recognized, however, that the Federal Aviation Anti-Hijacking Security System must be viewed differently from police measures intended to halt transport by air of contraband. The purpose of the FAA search and surveillance system was seen as insuring that dangerous weapons will not be carried onto an airplane and to deter potential hijackers from

attempting to board. This acceptance of the necessity to search was not given, however, without reservation and then only with considerable reluctance. It was stated that the intrusion of the system into the lives of potential passengers with its possibility of Fourth Amendment infringement may be justified only if the pre-boarding inspection techniques are confined to *minimally intrusive techniques. (People* v. *Hyde,* 12 Cal.3d 158, 165-168 [115 Cal.Rptr. 358, 524 P.2d 830].)

It requires no great imagination to see that these minimally intrusive techniques, designed to thwart the carrying of weapons on board an airplane, might develop into a maximum and unreasonable interference with the right of privacy if the protection of an entire terminal was attempted. The terminal would become a place of such restraint as to constitute a self-defeating transportation bottleneck.

■ Stripped of conclusionary allegations the complaints before us do not plead a defect in the physical condition of the property but instead allege that the property was in a dangerous condition because the City did not undertake to search and screen persons who sought to use the public locker facilities. In short, a failure to take police action.

The complaints here set forth no facts which give rise to the duty on the part of the City to expand its policing of the airport terminal. Nor do the complaints allege facts from which it could even be inferred that the condition of the terminal was the "cause" of the explosion. This tragic event was solely the result of the criminal conduct of a third person unaided by any act or omission on the part of the City.

The judgments are affirmed.

Roth, P. J., and Beach, J., concurred.

Petitions for a rehearing were denied April 6, 1977, and on April 11, 1977, the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied May 12, 1977.