[No. B007195. Second Dist., Div. Five. Nov. 18, 1985.]

ERLINDA MERCADO ANTENOR et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent.

**COUNSEL**

Contarino, Hutchinson & Cherin and Robert B. Hutchinson for Plaintiffs and Appellants.

Gary R. Netzer and James K. Hahn, City Attorneys, John T. Neville and Richard M. Helgeson, Assistant City Attorneys, for Defendant and Respondent.

## OPINION

**RILEY, J.***—On February 12, 1979, at approximately 6:20 p.m., pedestrians/plaintiffs Erlinda Mercado Antenor and her husband, Abraham Reyes Antenor, (plaintiffs) were struck in an unmarked crosswalk by a westbound 1979 Buick, as they were crossing Third Street, south to north, on the westerly side of the Grammercy Place intersection.

On November 30, 1979, plaintiffs filed a personal injury damage suit against the City of Los Angeles (the City) alleging that the City was maintaining a dangerous condition of public property.

At the conclusion of the evidence, the trial court granted the City's motion for a directed verdict. Plaintiffs have appealed.

### APPELLANT'S CONTENTION

Plaintiffs/appellants contend that the lack of pedestrian and/or traffic control, inadequate lighting, high traffic volume and the "geometrics" of Third Street at the intersection combined to create a "dangerous condition." It is further their contention that the existence of a "dangerous condition" is a factual question for the jury and not one to be determined by the court on a motion for a nonsuit.

### DISCUSSION

Preliminarily, it is necessary to detail the physical characteristics of the intersection in question and to set out certain pertinent evidence as it bears upon the issues.

#### I

Third Street at its intersection with Grammercy Place is 54 feet wide with two lanes in each direction, plus a left turn channel. No traffic signals or stop signs are present. There are no painted pedestrian crosswalks, no signs warning of pedestrian traffic, and no signs prohibiting pedestrians from crossing Third Street at this location.[1]

The easterly line of sight from the Grammercy intersection is 430 feet. From St. Andrews Place, the first intersection to the east, Third Street

---

*Assigned by the Chairperson of the Judicial Council.

[1]Marked crosswalks at the intersection were removed in 1976 when the City put in the left turn channels following a traffic study.

slopes downward to Grammercy—6 percent according to the city engineers, and 7 percent according to Allen Weber (Weber), plaintiffs' expert. This was referred to by Weber as the "geometrics" of the road, and as its "vertical curve."

Using a light meter, Weber measured the foot candles of the light intensity at each of the four corners of the intersection, and made the following findings: On the southwest corner, the illumination level was .18 foot candles; on the northeast corner, .12 foot candles; the northwest corner, .08 foot candles; and the southeast corner, .6 foot candles.

Lighting guidelines promulgated by the California Department of Transportation in its State Traffic Manual provide: " 'In urban areas and expressways, 0.15 horizontal foot candles on the area normally bound by the crosswalks and .6 horizontal foot candles at the intersection of center lines of the entering streets.' "

However, in the foreword to the manual, the limiting language appears: " 'This manual establishes uniform policies and procedures for traffic functions of the Department of Transportation. It is neither designed as, nor does it establish a legal standard for these functions.' "

The American National Standard recommended guidelines, as published by The Illuminating Engineering Society, are 1.4 foot candles for a major street, .9 for a collector street, and .6 for a local street. Its disclaimer language is even more illuminating: " 'The primary purpose of this standards practice is to serve as a basis for designing affixed lighting for roadways, bikeways and pedestrians. The standard practice deals entirely with lighting and does not give advice on construction practice. It is neither intended as, nor does it establish a legal standard for roadway lighting systems. Its purpose is to provide recommended practices for designing new roadway lighting systems, and it is not intended to be applied to existing lighting systems until such systems are redesigned. It has been prepared to advance the art, science and practice of illumination as it pertains to roadway lighting in North America.'

" '. . . . . . . . . . . . . . . . . . . . . . .

" 'The decision to provide roadway lighting at a particular road location should be made on the basis of a detailed study, thus the publication is not a substitute for reasoned judgment. Variations may be considered from this standard practice based upon sound engineering judgment.' "

Although Weber testified that he considered Third Street to carry heavy traffic, nothing in the evidence indicates that traffic volume had anything to

do with the accident. Less than 60 days prior to February 12, 1979, the City had conducted a traffic safety engineering study at the Third Street/ Grammercy intersection, and had concluded that no marked crosswalks, traffic stop signs or signal lights were necessary. The records of the senior traffic engineer's office showed that since 1976, when the marked crosswalk was removed in favor of the left turn channel, only two requests for a reinstallation had been received, one in 1978 and the other in 1979. In response to these inquiries, a manual pedestrian crossing count had been undertaken on September 14, 1978, (a Thursday) between the hours of 7 a.m. and 10 a.m., and again from 3 p.m. and 6 p.m. During that six-hour period, 20 pedestrians had crossed Third Street at Grammercy, as contrasted with the 148 crossing Grammercy at Third. The nighttime vehicular accident history at the intersection is not remarkable—never more than one a year, and some years, none at all. There had been no pedestrian versus auto accidents.

## II

Stripped of all the nonessential language, there were two grounds for the City's motion for nonsuit: (1) there was insufficient evidence as a matter of law (Gov. Code, § 830.2) to support a finding that the Third Street/Grammercy Place intersection created a "dangerous condition,"[2] and (2) the design immunity of Government Code section 830.6 applies to the facts of this case.

## III

While recognizing that Government Code section 830.2 codified a line of decisions involving breaks, depressions and irregularities in sidewalk surfaces, the Law Revision Commission comment is instructive upon the scope of the section. "This section declares a rule that has been applied by the courts in cases involving dangerous conditions of sidewalks. Technically it is unnecessary, for it merely declares the rule that would be applied in any event when a court rules upon the sufficiency of the evidence. It is included in the chapter to emphasize that the courts are required to determine that there is evidence from which a reasonable person could conclude that a substantial, as opposed to a possible, risk is involved before they may permit the jury to find that a condition is dangerous."

---

[2]Government Code section 830.2 provides, in pertinent part, that: "A condition is not a dangerous condition . . . if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used."

*Barone* v. *City of San Jose* (1978) 79 Cal.App.3d 284, at pages 290-291 [144 Cal.Rptr. 836], a case involving a fall on a public sidewalk, suggests the proper approach: "Our analysis of the cases in this field, despite some overlapping language, persuades us that the correct approach in cases of this nature is to determine first if the claimed defect is too trivial, as a matter of law, to be dangerous. An inquiry into this issue is a logical preliminary step before reaching the larger question of whether the nature of the defect, along with other circumstances, is sufficient to raise a jury question concerning notice. This initial inquiry into the question of . 'dangerousness' would involve consideration of such matters as the size and location of the defect with respect to the surrounding area and lighting conditions and whether it has been the cause of other accidents; while the question of notice would necessarily involve not only the factors which are primarily related to 'dangerousness,' but also such matters as the visibility of the condition, the frequency of travel in the area and the probability, if any, that a reasonable inspection by the appropriate public officials would have discovered its existence and its dangerous character."

To the same effect is *Fielder* v. *City of Glendale* (1977) 71 Cal.App.3d 719, 734 [139 Cal.Rptr. 876], another sidewalk case. "We hold that, in the first instance, it is for the court to determine whether, as a matter of law, a given defect is not dangerous. This is to guarantee that cities do not become insurers against the injuries arising from trivial defects."

In discussing the effect of Government Code section 830 and its definition of "dangerous condition," the court said ". . . [t]his section states that a condition of property is dangerous when it gives rise to there being a substantial risk of injury when the property is used with due care in a manner in which it is reasonably foreseeable that it will be used. Thus, the evidence that other accidents have occurred on the same spot goes toward proof that there is a substantial risk that injury will occur by persons using the sidewalk with due care." (71 Cal.App.3d at p. 733.)

*McKray* v. *State of California* (1977) 74 Cal.App.3d 59 [141 Cal.Rptr. 280] was a traffic case in which plaintiff alleged that the failure to place a guardrail in front of a concrete abutment created a dangerous condition, and, at the very least, a less serious accident would have occurred. The trial court granted a motion for summary judgment and the Court of Appeal affirmed, saying: "A public entity is liable 'for injury caused by a dangerous condition of its property' upon proof 'that the injury was proximately caused by the dangerous condition, [and] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred.' (Gov. Code, § 835.) ' "Dangerous condition" means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant)

risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used.' (Gov. Code, § 830.)" (74 Cal.App.3d at p. 62.)

## IV

We turn now to the evidence for examination in the light of the foregoing authorities.

First, plaintiffs allege that a lack of pedestrian or traffic control contributed to the purported "dangerous condition." However, the City's traffic engineering studies, conducted less than 60 days before the accident, showed no necessity for marked crosswalks, stop signs or signal lights. There had never been a pedestrian versus auto accident at the intersection, and no attack on the conclusions of that study was made by the plaintiffs.

Second, plaintiffs ask, what about the inadequate lighting? Weber testified that a pedestrian on the southwest corner of the intersection looking easterly up Third Street could see all the way up to the St. Andrews Place intersection, 430 feet away. (The fact that the offending Buick had its lights on would have increased its visibility to the plaintiffs.) He also conceded that Third Street met stopping distance standards. An eyewitness, Mr. Arterbury (Arterbury), testified that he saw the plaintiffs crossing Third Street from a point somewhat past the St. Andrews intersection, but not yet halfway between St. Andrews and Grammercy.

Granted that the lighting at the Grammercy intersection was below American National Standards, and both above and below the guidelines of the State Traffic Manual, the fact remains that plaintiffs were seen by Arterbury at a distance of somewhat over one-half of 340 feet. In any event, we have been cited no statutory or city charter authority to require the City to light its streets in the first instance. ▪ The general rule is stated in 39 American Jurisprudence Second, Highways, Streets and Bridges, section 405 at pages 803-804: "In the absence of a statutory or charter provision to the contrary, it is generally held that a municipality is under no duty to light its streets even though it is given the power to do so, and hence, that its failure to light them is not actionable negligence, and will not render it liable in damages to a traveler who is injured solely by reason thereof. [Fn. omitted.] A duty to light, and the consequent liability for failure to do so, may, however, arise from some peculiar condition rendering lighting necessary in order to make the streets safe for travel. [Fn. omitted.]"

▪ Third, we are told that the high traffic volume on Third Street was a factor contributing to the "dangerous condition." The witness, Arterbury,

a passenger in a vehicle also proceeding west on Third Street at the time, was interrogated about the presence of other westbound vehicles ahead of the Buick.

His answer was "No, we were the only two out there."

Whatever high volume traffic may mean in another context, it was not a factor here.

And, fourth and last, plaintiffs urge that the "geometrics" of Third Street created the "dangerous condition." We refer briefly to Weber's conclusion that the easterly line of sight from Grammercy toward St. Andrews was at least 430 feet. Additionally, under adroit cross-examination, he conceded that the curvature of the street (the downslope) was acceptable for stopping sight distances.

"Q. By the way, the curvature of the road there is a reasonable standard, is it not?

"I mean, it is an acceptable standard?

"A. For stopping sight distance?

"Q. Yes, for a motorist going westbound, that is an acceptable stopping sight distance, is it not?

"A. Yes, it meets the stopping sight distance standards. Yes."

We have not lost sight of plaintiffs' contention that these four physical factors have combined to create the "dangerous condition" which plaintiffs must establish if they are to survive the nonsuit. However, if each of the four has a zero danger factor, it cannot be said that any alchemist's process will create one for the whole.

Plaintiffs have contended that inasmuch as their expert witness, Weber, testified that a "dangerous condition" existed, this issue should have gone to the jury. However, as in *McKray, supra,* 74 Cal.App.3d 59, the court affirmed a summary judgment against the plaintiff notwithstanding an expert's opinion.

From a review of the entire record, we find as a matter of law that the risks, if any there were, existing at the Third Street/Grammercy intersection were of such a minor, trivial or insignificant nature that no reasonable person would conclude that there existed a substantial risk of injury. It is our

opinion from all of the evidence that the cause of this tragic occurrence must be laid solely upon a grossly inattentive Buick driver and two equally inattentive plaintiffs.

We have examined and considered the arguments and authorities provided by the plaintiffs, and while they have been ably presented and forcefully urged, in our view they are not persuasive.

In the light of this holding, we need not review the City's exemption under design immunity.

### DISPOSITION

The judgment is affirmed.

Ashby, Acting P. J., and Eagleson, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 13, 1986.