[No. D046281. Fourth Dist., Div. One. Feb. 28, 2006.]

CITY OF SAN DIEGO, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
DEBORAH J. HANSON et al., Real Parties in Interest.

**COUNSEL**

Michael J. Aguirre, City Attorney, and David Engel-Brodie, Deputy City Attorney, for Petitioner.

No appearance for Respondent.

William J. Roberts for Real Parties in Interest.

**OPINION**

**BENKE, Acting P. J.**—An illegal street race resulted in the death of nonrace participants Shanna Jump and Brian Hanson (Brian) and the serious injury of Michael Hanson (Michael). Michael and the parents of Brian sued the race participants and City of San Diego (City). As to City, plaintiffs stated causes of action for the dangerous condition of public property, wrongful death and the negligent infliction of emotional distress. City sought summary judgment, arguing the street on which the accident occurred was not in a dangerous condition. The trial court denied the motion. City petitioned for a writ of mandate and this court ordered the trial court to show cause why the relief requested should not be granted. We grant City's petition for peremptory writ of mandate.

BACKGROUND

A.  *Complaint*

The complaint alleges at approximately 7:00 p.m. on October 6, 2002, an illegal street race between two cars, one without its lights on, was underway northbound on Imperial Avenue between 69th Street and Viewcrest Drive in the City of San Diego. As the racers neared Viewcrest Drive, a car driven by Shanna Jump began a turn from southbound Imperial Avenue to Viewcrest

Drive. As her car turned across Imperial Avenue, it was struck in the side by the vehicle racing without its headlights on. The catastrophic collision resulted in Jump's death and the death of her passenger Brian and the serious injury of the other passenger, Michael.

With regard to their causes of action against City for the maintenance of a dangerous condition, plaintiffs alleged at trial City was aware the straight, quarter-mile length of Imperial Avenue between 69th Street and Viewcrest Drive had been the frequent scene of street races since 1992. Imperial Avenue in that area is two lanes in each direction, the posted speed limit is 50 miles per hour and there are no traffic controls, speed bumps or natural conditions that deter street racing. The finish line for the races is the intersection at Viewcrest Drive. The length of road on which the races occur is poorly lighted at night. The complaint alleged drivers attempting to turn across Imperial Avenue at that location are in danger because, given the poor illumination, they cannot see or gauge the speed of approaching racers.

B. *Motion for Summary Judgment*

City filed a motion for summary judgment, arguing that as to the cause of action for the maintenance of a dangerous condition of public property, no triable issue of fact existed because it owed no duty to plaintiffs to protect against third party criminal activity, and the street where the accident occurred had no defects and is safe when used with care. City argued it was immune from liability for lack of police protection, lack of traffic signs or signals, or the lack of street lighting. Additionally, City noted it had taken reasonable steps to curtail street racing in the city.

C. *Opposition to Motion for Summary Judgment*

Plaintiffs argued there were defects in the condition of Imperial Avenue at the location of the accident. They argued the divided road, with two lanes in each direction, with few intersections and with a long, level, unobstructed straightaway was an invitation to street racing. The danger was increased because poor lighting at the scene made it difficult for drivers to see or gauge the closing speed of cars racing on the street.

D. *Denial of Motion for Summary Judgment*

The trial court denied City's motion for summary judgment. It noted whether a given set of facts or circumstances creates a dangerous condition is generally a question of fact. It concluded while a public entity has no duty to protect persons from criminal activity, a duty could exist when the very basis

for the public entity's claimed negligence is that it created a reasonably foreseeable risk of such third party conduct.

The court noted evidence that because the intersection was poorly lighted and because shadows were cast on the roadway by trees, it appeared to drivers turning across Imperial Avenue that approaching traffic was traveling much slower than it actually was. The court concluded this evidence created a triable issue of fact concerning whether City maintained the roadway in a dangerous condition.

### E.  *The Petition*

In its petition City argues the trial court erred in denying its motion for summary judgment. It contends because none of Imperial Avenue's features create a substantial risk of injury when the street is used with due care, the court erred in finding the street could be in a dangerous condition. Additionally, City argues the court erred in finding it had a duty to install additional streetlights because nothing about Imperial Avenue makes lighting necessary for safe travel.

An order denying a motion for summary judgment may be reviewed by a petition for writ of mandate. Where the trial court's denial of a motion for summary judgment would result in a trial on nonactionable claims, a writ of mandate will issue. (*Hill Brothers Chemical Co. v. Superior Court* (2004) 123 Cal.App.4th 1001, 1005 [20 Cal.Rptr.3d 530].)

A party moving for summary judgment bears the burden of persuasion there is no triable issue of material fact and is entitled to judgment as a matter of law. A defendant satisfies this burden by showing one or more elements of the cause of action in question cannot be established or there is a complete defense to that cause of action. If the defendant meets this initial burden, the opposing party must then make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

We review the denial of a motion for summary judgment de novo. (*Camarillo v. Vaage* (2003) 105 Cal.App.4th 552, 560 [130 Cal.Rptr.2d 26].) We strictly construe the moving party's affidavits and liberally construe the opposing party's affidavits. We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (*Fraizer v. Velkura* (2001) 91 Cal.App.4th 942, 945 [110 Cal.Rptr.2d 918].)

## DISCUSSION

### A. *The Accident and the Street Race*

On October 6, 2002, at approximately 7:00 p.m., at dusk, two cars were racing northbound on Imperial Avenue. At that location the roadway is divided, straight and relatively level. The race was occurring at over 85 miles per hour. Imperial Avenue has two lanes of travel in each direction. The speed limit on that section of the road is 50 miles per hour. One racer's vehicle had its headlights on; the other did not. As the race neared the intersection of Viewcrest Drive, a car driven by Jump began a left turn from the southbound lanes of Imperial Avenue to Viewcrest Drive. As she did so, her car was struck broadside by the racer's vehicle without its headlights on. The collision resulted in the death of Jump and one of her passengers and the serious injury of another passenger in her car.

There were two witnesses to events surrounding the accident. Moments before the accident, Juan Tavares was parked on Viewcrest Drive at its intersection with Imperial Avenue. He heard the sound of what he described as a "v-eight muscle car" coming up Imperial Avenue. Tavares could see one set of headlights approaching from the direction of the engine noise. One car turned from the southbound lanes of Imperial Avenue across the path of the oncoming car and successfully exited onto Viewcrest Drive. Tavares then saw Jump attempt the same turn. Tavares believed Jump's car would be able to clear the intersection before the oncoming car reached it. However, the car racing without its headlights on and not seen by Tavares was moving up Imperial next to the racing car with its headlights on. In the last seconds before impact, Tavares saw the car racing without its headlights on and knew there was going to be a collision. The racing car without its headlights on struck Jump's vehicle.

Jonathan Spooner was the driver who turned across the intersection before the accident. As Spooner began to make his turn, he checked for oncoming traffic. Spooner noticed a car parked at the end of Viewcrest Drive. Its occupants were standing outside looking down Imperial Avenue. Spooner, aware Imperial Avenue was used for street racing, made an effort to look farther up the street than he normally would have done. Given the poor lighting conditions, Spooner squinted to improve his vision of oncoming vehicles. Spooner noticed a car with its headlights on coming towards him in the lane closest to the center of the road. Spooner could see a second car without its headlights on next to the first car. Spooner was able to see the

second car because it was slightly ahead of the first car and the headlights of the first car illuminated its side.[1]

City conceded the intersection of Imperial and Viewcrest is not well lighted in the evening. Plaintiffs stated it was not lighted at all. Pursuant to City policy and subject to the availability of funds, 34 additional streetlights would be appropriate along the area of Imperial Avenue where the race occurred. A visibility expert stated that given the lighting conditions, it would have been difficult to see the car without its headlights on coming up Imperial Avenue at the time of the accident.

A resident of the neighborhood stated that in making the left turn from southbound Imperial Avenue to Viewcrest Drive, it is difficult at all hours to see and gauge the speed of oncoming vehicles. She stated perhaps because of the long straightaway and the shadows of trees lining the road, it appeared cars were approaching more slowly than they actually were.

Other residents stated that given the lighting on Imperial Avenue at night, a driver attempting to cross to Viewcrest Avenue would not see a car approaching that did not have its headlights on. In any case, at dusk, because the road is very straight at that location, it is difficult to judge the distance and speed of an oncoming car. Still others believed that estimation of speed is difficult but the turn can be made safely by waiting or that they have no difficulty at all.

The parties agreed illegal street racing has occurred in City of San Diego and on Imperial Avenue for decades. City passed ordinances to deal with the problem and created a special police unit that addressed such racing. Some success was achieved and the number of deaths caused by illegal racing in the city was declining. Races, however, still occurred.

Residents in the area of Imperial and Viewcrest repeatedly and over a long period of time reported street racing to the police. The parties disagreed concerning how often the police sent officers to investigate. No member of the police street-racing unit, however, was aware the area of Imperial Avenue and Viewcrest Drive was a racing site. Although a fatal accident occurred at the intersection in 2000, the police determined the accident was not street-racing related. There was evidence, however, suggesting the contrary.

Before and after the collision, City's traffic engineering staff evaluated the intersection of Imperial Avenue and Viewcrest Drive for a stoplight, stop

---

[1] In the trial court, in plaintiffs' statement of evidence supporting their opposition to the motion for summary judgment, they state Spooner believed poor lighting was a contributing factor to the accident. The parts of his deposition cited, however, do not support this assertion.

signs, road bumps, lowering of the speed limit and blocking off one of the northbound lanes. It concluded a stoplight or stop signs were not warranted, road bumps and other devices were impractical or illegal, the speed limit was within state-mandated specifications, and traffic volume was too great to block off a lane.

The plaintiffs' traffic engineering expert evaluated the operating characteristics of Imperial Avenue at the site of the accident. He concluded the basic design of the intersection was sound but the speed of a majority of the traffic at that location exceeded the 50 mile-per-hour speed limit and many vehicles were traveling in excess of 60 miles per hour. The area was one of few intersections and this tended to prompt high speeds. The expert concluded given the complaints received by City concerning street racing on Imperial Avenue near the intersection of Viewcrest Drive, it should have addressed the issue of illumination in the area to enable drivers to notice vehicles and gauge their distance and speed.

B. *Law*

Government Code[2] section 835 states in relevant part: "[A] public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred . . . ."

Section 830, subdivision (a), defines "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

The existence of a dangerous condition is ordinarily a question of fact; however, it can be decided as a matter of law if reasonable minds can come to only one conclusion concerning the issue. (*Bonanno v. Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148 [132 Cal.Rptr.2d 341, 65 P.3d 807].)

Determining whether a dangerous condition exists for which a public entity may be held liable is a complex question. The development of the law rests on varied fact patterns. It also rests on legal vocabulary which is at times drawn broadly and at times narrowly. It is no simpler where, as here,

---

[2] All further statutory references are to the Government Code unless otherwise specified.

third party liability is involved. However, as the Supreme Court has noted: " '[T]hird party conduct by itself, unrelated to the condition of the property, does not constitute a "dangerous condition" for which a public entity may be held liable.' [Citation.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1134 [119 Cal.Rptr.2d 709, 45 P.3d 1171] (*Zelig*).) " 'If the risk of injury from third parties is in no way increased or intensified by any condition of the public property . . . courts ordinarily decline to ascribe the resulting injury to a dangerous condition of the property. In other words, there is no liability for injuries caused *solely* by acts of third parties. [Citations.] Such liability can arise only when third party conduct is coupled with a defective condition of property.' [Citations.]" (*Id.* at p. 1137.)

As the Supreme Court instructs us in *Zelig,* for purposes of deciding when a dangerous condition exists in cases involving third party conduct, it is necessary that two elements be addressed. The first is whether it can be said the defect complained of describes a dangerous physical condition and second, whether the dangerous condition has a causal relationship to the third party conduct that actually injured the plaintiff. As to the first element, the court in *Zelig* notes the necessary coupling of third party conduct and defective condition occurs where the property itself exists in a dangerous condition, and that condition increases or intensifies the risk of injury to the public. (*Zelig, supra,* 27 Cal.4th at pp. 1136, 1138.) Such condition "[m]ost obviously . . . exists when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself." (*Bonanno v. Contra Costa Transit Authority, supra,* 30 Cal.4th at p. 148.) Thus it has been held the failure of a government entity to light a beach at night does not constitute a defective condition because unlighted beaches are not inherently dangerous. (*Hayes v. State of California* (1974) 11 Cal.3d 469 [113 Cal.Rptr. 599, 521 P.2d 855].) Likewise, the failure to prevent weapons from being brought onto school grounds does not describe any physical condition of the school property. (*Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707 [230 Cal.Rptr. 823].) And locating lockers in an area of an airport terminal accessible to the public without screening for bombs and weapons did not create a dangerous condition of property. (*Moncur v. City of Los Angeles* (1977) 68 Cal.App.3d 118, 126 [137 Cal.Rptr. 239].) However, an intersection operating with malfunctioning traffic signals has been held to be a defective physical condition (*Mathews v. State of California ex rel. Dept. of Transportation* (1978) 82 Cal.App.3d 116, 120 [145 Cal.Rptr. 443]) as has city property where plantings obscured a stop sign (*De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 745–746 [94 Cal.Rptr. 175]).

A dangerous condition may also exist where a public entity can be said to maintain defective property. (*Zelig, supra,* 27 Cal.4th at pp. 1134–1135.) Maintenance of defective property has been held to exist

where a college planted thick foliage near a parking lot and stairway, thereby creating a physical situation facilitating crimes against students. (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193].) The court in *Zelig* notes that inadequate lighting in an airport parking lot where there was notice of criminal activity likewise presents a defective physical condition (see *Slapin v. Los Angeles International Airport* (1976) 65 Cal.App.3d 484, 488 [135 Cal.Rptr. 296]), as does a public entity's failure to install a median in order to cure a dangerous physical condition (see *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707 [159 Cal.Rptr. 835, 602 P.2d 755]). (See also *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789 [198 Cal.Rptr. 208] [public entity failed to place barriers in a critical access location to prevent vehicles from driving onto a beach and hitting people].) However, again, the court in *Zelig* emphasized that in cases where maintenance is an issue, liability is still imposed only when there is some defect in the property itself. (*Zelig, supra,* 27 Cal.4th at pp. 1135, 1138–1139.)

In addition to the existence of a defective condition of property, *Zelig* instructs us the defect in the physical condition of the property must also have some causal relationship *to the third party conduct that actually injures the plaintiff.* (*Zelig, supra,* 27 Cal.4th at p. 1136.) The court notes in *Constance B. v. State of California* (1986) 178 Cal.App.3d 200 [223 Cal.Rptr. 645] the public entity was not liable for failing to enhance the safety of motorists at a highway rest stop. There the plaintiff alleged placement of lights and trees cast a shadow over the entrance of a women's restroom where she was assaulted, thereby facilitating such crimes. The court noted there was no evidence the assailant's conduct was influenced by the existence of the shadows. (*Zelig, supra,* 27 Cal.4th at p. 1136; also see *Moncur v. City of Los Angeles, supra,* 68 Cal.App.3d at p. 126.) On this point we find instructive the *Zelig* court's final analysis of the facts before it. The court states: "In the present case, the risk of injury was not increased or intensified by the condition of the property, and the necessary causal connection between the condition of the property and [the] crime was not present." (*Zelig, supra,* 27 Cal.4th at p. 1137; see also *id.,* p. 1140.)

## C.  *Application of the Law to This Case*

We conclude the elements required under the *Zelig* analysis of government entity liability in third party conduct cases are absent.

■ We cannot conclude the roadway was inherently defective at the time of this accident. Despite the lack of lights, there is no claim that if used by all drivers in the manner intended there is some inherent defect in the roadway where the accident took place. It was undisputed the road is straight and

level, and has few intersections and no sight line obstructions. While it is true that the very safety and sense of security these features create encourage drivers—those involved in street racing and others—to exceed the speed limit, this does not establish a dangerous physical condition for purposes of section 835. If it did, we would have to conclude every straight, level, unobstructed but unlighted freeway or road would be in an unsafe physical condition if drivers exceeded the speed limit, causing accidents.

Plaintiffs, however, argue the physical condition of the property should have been altered by City to make it safer. They urge had there been lights on the roadway, Jump would have been able to better see the approaching street racers and gauge their speed. For purposes of liability under section 835, this argument presents two difficulties with which we must struggle. The first is whether the failure to install lighting to better see those potentially violating the law describes a physical condition of property. In the context of the facts in this case, without a showing of previous accidents caused by poor lighting, we are led to conclude that the lighting is sought as a preventative safety measure. As such, it does not describe a defective physical condition any more than would an entity's failure to provide adequate lights to assure assaults do not take place at a highway rest stop (*Constance B. v. State of California, supra,* 178 Cal.App.3d 200) or, as was the case in *Zelig,* to provide additional security in public buildings.

When faced, as we are, with a road which is otherwise safe if used as it should be used by the public, it is not possible to say how much, if any, lighting is necessary to protect all drivers from speeding vehicles. One can postulate multiple patterns of third party conduct under which a prudent driver, even with significant lighting in place, still might not see oncoming cars or be able to gauge their speed. Here, for example, unrelated to the presence of lights, the racing vehicle that struck Jump was driving at least part of the time behind another vehicle and it did not have its headlights on. Under these circumstances we cannot discern how much lighting of the roadway at dusk would have improved Jump's ability to see the oncoming racers.

The second difficulty is that even if we were to conclude a defective physical condition exists for failure to install lighting, there is no evidence the racers were influenced by the absence of street lights.

We conclude there was no physical defect in the roadway and in any event there is no evidence connecting the absence of lighting to the third party conduct.

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order of March 29, 2005, denying summary judgment and to enter an order granting City summary judgment. The stay issued by this court on June 6, 2005, is vacated. Each party to bear its own costs on appeal.

McDonald, J., concurred.

**McINTYRE, J.**, Concurring.—I concur with the majority that the City of San Diego's (City) writ petition should be granted. The majority holds both that the evidence fails to establish a dangerous condition of public property and that there is no triable issue on whether any such condition proximately caused the auto accident, injuries and deaths.

On the "dangerous condition" issue, I agree that the fact the City knew that vehicles frequently raced along this stretch of Imperial Avenue is not a sufficient basis to impose liability. However, there was also a great deal of evidence that lighting conditions were poor and made it difficult for drivers attempting a left turn at the intersection where the accident occurred to see vehicles approaching and to determine their distance and speed. From this, a rational trier of fact might infer that the street lighting could contribute or create a dangerous condition of public property at dusk or after dark.

While a public municipal entity is ordinarily immune from liability for failure to light its streets, a duty to light, and the consequent liability for failure to do so, may arise from some peculiar condition rendering lighting necessary to make the streets safe for travel. (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 483 [220 Cal.Rptr. 181].) Plaintiffs contend this case involved just such a condition and offered sufficient evidence to create a triable issue of fact on this issue. Thus, I would not grant the petition based on the failure of plaintiffs to establish a dangerous condition.

However, in my view, the analysis of the California Supreme Court in *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112 [119 Cal.Rptr.2d 709, 45 P.3d 1171] applies here. There is insufficient evidence of a causal connection or nexus between the general lighting of the area and this accident. The vehicle operated by the plaintiffs' decedent made a left turn to cross two lanes of oncoming traffic. Her vehicle cleared the first lane (the lane in which one racing vehicle had its lights on) before being struck by the unlit racing vehicle in the outside lane. Its speed at impact was estimated at 75 miles per hour plus after braking from approximately 85 miles per hour (in a 50 mph zone). Since the driver was killed, we do not know what she did or did not observe before making the left turn. To implicate street lighting as a proximate

cause of the collision is to speculate, not draw a reasonable inference. Plaintiffs have not shown facts for which a causal relationship between the collision and street lighting can be inferred by a trier of fact. Accordingly, I concur in the judgment.

The petition of real parties in interest for review by the Supreme Court was denied June 14, 2006, S142577. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.