Filed 1/9/26  Solorio v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ROBERT SOLORIO, as Guardian ad litem, etc. et al., | F088506 |
| Plaintiffs and Appellants, | (Super. Ct. No. 21CECG03078) |
| v. | |
| CITY OF FRESNO, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Kiesel Law, Paul R. Kiesel, D. Bryan Garcia, Lauren M. Kiesel and Lisa M. Freeman, for Plaintiffs and Appellants.

Whitney, Thompson & Jeffcoach, Mandy L. Jeffcoach, Steve M. McQuillan and Jaskarn S. Chahal for Defendant and Respondent.

-ooOoo-

Ana Solorio sued the City of Fresno (City) for wrongful death and personal injuries resulting from a 2020 train versus automobile collision.  Solorio's minivan stopped in bumper-to-bumper traffic on railroad tracks while queuing with other cars for

an annual holiday lights event in the City.  A train collided with the minivan fatally injuring Solorio's five-year-old son and seriously injuring Solorio and two other family members.  Solorio and the other surviving passengers (collectively plaintiffs) alleged the City was liable for creating a dangerous condition of public property, negligence for breaching a mandatory duty, and negligent infliction of emotional distress.  The City demurred to the complaint.  The trial court sustained the City's demurrer without leave to amend and entered judgment in favor of the City.

Plaintiffs contend the trial court erroneously sustained the City's demurrer because:  (1) the City created a dangerous condition of public property under Government Code[1] section 835 by creating a temporary parking lot that funneled queuing vehicles over active railroad tracks; (2) the City was negligent for failure to discharge a mandatory duty to not create conditions where vehicles can queue over railroad tracks; and (3) plaintiffs can bring a negligent infliction of emotional distress claim under the Government Claims Act (§ 810 et seq.; the Act).  Plaintiffs argue that, at minimum, they should be granted leave to amend the complaint.  We agree with the latter contention.

We conclude the City's demurrer was properly sustained but leave to amend must be granted.  We therefore reverse the judgment and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Facts*[2]

For nearly 100 years, the Fig Garden Homeowners Association (Fig Garden) has organized, in coordination with the City, an annual Christmas Tree Lane event (the Lane) in Fresno.  The Lane consists of houses and trees decorated with millions of lights for

---

[1]    Undesignated statutory references are to the Government Code.

[2]    The facts are drawn from the allegations of the operative complaint which we assume to be true at the demurrer stage.  (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209.)

approximately two miles on North Van Ness Boulevard between Shields Avenue and Shaw Avenue. The Lane draws thousands of patrons from all over the Central Valley.

Prior to 2020, the Lane was separated into "walk nights" on which the street was closed to vehicular traffic so patrons could walk along the Lane, and "drive nights" on which patrons could drive down the Lane. Ordinarily, Van Ness has two-way traffic going northbound and southbound. On drive nights, Van Ness was converted to one-way traffic beginning at 6:00 p.m. when the lights turn on. Vehicles can only enter the Lane from westbound Shields Avenue by making a right onto northbound Van Ness. Due to COVID-19 restrictions, walk nights for the Lane were eliminated in 2020.

On the evening of December 1, 2020, Ana Solorio was driving her minivan westbound on Shields Avenue to view the Lane with her mother, Cirenia Lozono, in the passenger seat, and Ana's two sons, Ian and Anton,[3] in the second row of the minivan. Before turning right onto northbound Van Ness, the minivan was forced to unexpectedly come to a stop near a railway crossing due to congestion from other vehicles also waiting on Shields Avenue to enter the Lane. At approximately 5:38 p.m., a passenger train traveling southeasterly on the tracks collided with the minivan's passenger side. The collision seriously injured Ana, Cirenia, and Ian, and fatally injured Anton.

B.  The Complaint

In October 2021, plaintiffs—Ana, Cirenia, Ian, and Anton's father, Robert Solorio—filed their initial wrongful death and personal injury complaint against the City.[4] Ana, Cirenia, and Ian through his guardian ad litem, Robert, sought damages for their injuries. Ana and Robert sought damages for the wrongful death of Anton.

---

[3]  Because several plaintiffs share the same last name, we refer to plaintiffs by their first names for clarity. No disrespect is intended.

[4]  The complaint also named Fig Garden, the County of Fresno, BNSF Railway Company, and National Railroad Passenger Company dba Amtrak, as parties. The City is the only remaining defendant.

Plaintiffs filed the operative second amended complaint (SAC) against the City on March 8, 2024, alleging causes of action for negligence, dangerous condition of public property, and negligent infliction of emotional distress. For the negligence causes of action, the SAC alleged the City "failed to provide proper and adequate signage, lighting, highway markings, warnings, crossing guards and/or protective barriers" on the "drive nights" on the Lane. (Boldface omitted.) The SAC further alleged the City had constructive notice and actual knowledge the Lane "drew heavy traffic, and created traffic congestion for up to an hour prior to the opening of the event at, among other places, the entrance to the event off of Shields Avenue and at the Railroad Crossing/Accident Location." (Boldface omitted.) To support this allegation, plaintiffs alleged traffic congestion over and around the Lane led to a train and automobile collision at the railway crossing the previous year. They alleged the City in the exercise of due care should have implemented special traffic control measures including, "but not limited to special signage to warn vehicular traffic at, or near, the Accident Location, as well as the placement of crossing guards to protect vehicular traffic at, or near, the Accident Location." (Boldface omitted.) The City allegedly failed to provide any traffic control officers at or near the railway crossing, or any alternative traffic control devices to control the intersection. This failure and the routing of traffic to enter the Lane "causing traffic to back up on Shields Avenue" (boldface omitted) purportedly created a dangerous condition of public property.

The plaintiffs also alleged the City was negligent for breaching a mandatory duty under article 24 of the Fresno Code of Ordinances by failing to require Fig Garden obtain a special event permit or create a traffic control plan for the Lane. Plaintiffs claimed the City was vicariously liable pursuant to section 815.2 and liable for failing to discharge a mandatory duty under section 815.6.

C.      *The Demurrer*

In April 2024, the City demurred to the SAC.  The City argued a dangerous condition exists only when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users.  The City claimed plaintiffs' cause of action for a dangerous condition of public property is deficient because a public entity's failure to provide traffic control does not inherently constitute a dangerous condition and plaintiffs failed to identify a statutory basis for this claim.  Analyzing plaintiffs' cause of action for creating a dangerous condition under section 835, the City argued plaintiffs failed to allege a physical deficiency of property, because heavy traffic flow and the failure to implement traffic control measures are not a physical characteristic of public property.

The City asserted the cause of action for negligent infliction of emotional distress is defective, since it is not a distinct cause of action, but a form of potentially recoverable damages for a properly pled cause of action.  The City argued plaintiffs failed to cite a statutory basis permitting their negligent infliction of emotional distress cause of action.

Lastly, the City argued the statutes plaintiffs relied upon for liability—section 815.2 for vicarious liability and section 815.6 for failing to discharge a mandatory duty— do not support a claim for negligence.  The City claimed section 815.2 provides for vicarious liability to a public entity for its employees' negligence but liability for a dangerous condition is not governed by section 815.2.  The City also claimed section 815.6 imposes liability on a public entity when it fails to discharge a mandatory duty but the ordinances plaintiffs relied upon do not impose a mandatory duty on the City.

In their opposition to the City's demurrer, plaintiffs averred they were "not alleging a physical defect of the public property but, rather, the failure of the City's employees to perform their traffic control and supervision duties within the scope of their

5.

employment by the City." Plaintiffs requested the opportunity to amend the SAC should the trial court grant the demurrer. The City filed a reply to plaintiffs' opposition.

### D. The Trial Court's Ruling

On June 25, 2024, the trial court issued a tentative ruling. The court found to the extent plaintiffs were relying on section 835 to make a claim for creating a dangerous condition, they failed to allege a physical defect of the subject public property. The court sustained the cause of action for a dangerous condition of public property because plaintiffs failed to cite a statutory basis for liability and failed to allege a physical characteristic of the railway crossing that constituted a dangerous condition.

For the emotional distress cause of action, the trial court acknowledged such damages are potentially recoverable as a form of damages as part of the claim for creation of a dangerous condition of public property. But given plaintiffs failed to state a viable claim against the City based on a dangerous condition of its property, the court sustained the demurrer to the negligent infliction of emotional distress claim.

The trial court also sustained the demurrer to the negligence cause of action. The court observed the City's employees must be independently liable for the act or omission in question for the City to be vicariously liable under section 815.2. The court concluded the City's employees cannot be held independently liable for failure to provide traffic control because the employees, in their individual capacities, have no authority or responsibility to provide traffic control, and there can therefore be no vicarious liability to the City. With respect to a mandatory duty under section 815.6, the court found plaintiffs failed to allege an enactment that creates a mandatory, as opposed to discretionary or permissive, duty.

The trial court denied plaintiffs' request for leave to amend because plaintiffs failed to suggest any facts they could allege to identify a physical characteristic that would constitute a dangerous condition or a statutory basis for their claims. The court

concluded plaintiffs failed to establish a reasonable likelihood they can cure the defects by amendment.

Following oral argument on the tentative ruling the matter was submitted. The trial court later adopted its tentative ruling without modification. Judgment was entered in favor of the City on July 10, 2024. Plaintiffs timely appealed.

## DISCUSSION

### I. GENERAL LEGAL PRINCIPLES

#### A. *Standard of Review*

"A demurrer tests the legal sufficiency of the factual allegations in a complaint. We independently review the superior court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense." (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725.) We "treat the demurrer as admitting all material facts properly pleaded" and "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 (*Dinuba*).) We read the allegations of the complaint "in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties." (*Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1557; Code Civ. Proc., § 452.) We do not, however, assume the truth of contentions, deductions, or conclusions of law. (*Dinuba*, at p. 865.)

"If the pleading is insufficient on any ground specified in a demurrer, we will uphold the order sustaining it, even if it is not the ground relied upon by the trial court." (*Villafana v. County of San Diego* (2020) 57 Cal.App.5th 1012, 1017; *Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998.) When the trial court denies leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) The plaintiff bears the burden of proving there is a reasonable possibility of amendment. (*Ibid*.)

7.

*B.    Liability Under the Government Claims Act*

Under the Government Claims Act (§ 810 et seq.), "there is no common law tort liability for public entities in California; instead, such liability must be based on statute." (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 897 (*Guzman*).)  Specifically, section 815 provides:  "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  Accordingly, a public entity is not liable for any injury caused by the act or omission of the public entity or a public employee unless such liability is imposed by statute.  (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932.)

## II.    DANGEROUS CONDITION OF PUBLIC PROPERTY

*A.    Applicable Law*

Section 835 provides for direct liability of a public entity for injuries caused by a dangerous condition of public property.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347 (*Hampton*).)[5]  Section 835 requires a plaintiff to plead:  (1) the property was in a dangerous condition at the time of the injury; (2) the injury was proximately caused by the dangerous condition; (3) the dangerous condition created a reasonably foreseeable risk of the kind of injury the plaintiff sustained; and (4) either (a) a public employee negligently or wrongfully created the dangerous condition or (b) the public

---

[5]    Section 835 provides:  "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:  [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

entity had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against the dangerous condition. (*Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 653 (*Tansavatdi*).) "Thus, section 835 expressly authorizes two different forms of dangerous conditions liability: an act or omission by a government actor that *created* the dangerous condition (§ 835, subd. (a)); or, alternatively, failure 'to protect against' dangerous conditions of which the entity had notice (*id.*, subd. (b)).  The term 'protect against' is statutorily defined to include, among other things, 'warning of a dangerous condition.'  (§ 830, subd. (b).)"  (*Tansavatdi*, at p. 653.)

"A dangerous condition is one that 'creates a substantial risk of injury' when the property is 'used with due care in a manner in which it is reasonably foreseeable that it will be used.'  (§ 830, subd. (a).)"  (*Hampton*, *supra*, 62 Cal.4th at p. 348.)  "A dangerous condition exists when public property [1] 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or [2] possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users."  (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347–1348 (*Cerna*), citing *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148–149 (*Bonanno*).)  Conversely, section 830.2 states a condition is not dangerous "if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used."

"The limited and statutory nature of governmental liability mandates that claims against public entities be specifically pleaded.  [Citation.]  Accordingly, a claim alleging a dangerous condition may not rely on generalized allegations [citation] but must specify

in what manner the condition constituted a dangerous condition." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439 (*Brenner*).)

Though the existence of a dangerous condition ordinarily is a question of fact, "the issue may be resolved as a matter of law if reasonable minds can come to only one conclusion." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1133 (*Zelig*).) "[I]f the facts pleaded by the plaintiff as a matter of law cannot support the finding of the existence of a dangerous condition within the meaning of the statutory scheme, a court may properly sustain a demurrer to the complaint." (*Brenner*, *supra*, 113 Cal.App.4th at p. 440.)

B.    Analysis

1.    *"New" Theory on Appeal*

On appeal, plaintiffs argue changing a public street into a temporary parking lot or temporary waiting area over active railroad tracks constitutes a dangerous condition of public property. They contend the City created a dangerous condition by creating a waiting area for vehicles for a special event on a street with railroad tracks running through it. Plaintiffs claim the danger was in the funneling of stopped cars over railroad tracks. The City responds plaintiffs' arguments concerning a temporary parking lot are barred because they were not raised in the trial court. The City contends this case has "always" been about heavy traffic in the subject area and insufficient traffic control. In their reply brief, plaintiffs concede the SAC did not use the phrases "temporary parking lot" or "temporary waiting area," but argue these phrases are simply another way of describing stopped cars lined up before a special event to wait for the road ahead to open, i.e., facts consistent with the allegations in the SAC. They further argue even if this is a new legal theory, a plaintiff may argue a new theory on appeal from dismissal following a demurrer. Plaintiffs have the better argument. The facts supporting this theory of recovery were encompassed by the SAC's allegations and this alternative view of these

same facts may be raised for the first time on appeal regardless of whether it was specifically raised in the SAC.  (*Dinuba*, *supra*, 41 Cal.4th at p. 870.)

The SAC alleged the City had constructive notice and actual knowledge that on the Lane's drive nights "vehicular traffic would begin lining up and backing up approximately one hour before" the Lane opened and traffic would "back up along Shields Avenue including up to and past" the accident location.  (Boldface omitted.)  The SAC also alleged the City "knew, or in the exercise of due care should have known, that such traffic congestion routinely crossed over, blocked, and/or obstructed the Railway Crossing" (boldface omitted) and trains would pass through the accident location as vehicular traffic was backed up waiting for the Lane to open.  Liberally construed, these allegations arguably encompass plaintiffs' contentions on appeal about the danger of a "temporary parking lot" or "temporary waiting area" over railroad tracks although those specific phrases were not used in the SAC.

Even if plaintiffs' allegations constitute a new theory not previously raised, we disagree with the City that plaintiffs cannot raise a new theory on appeal.  The City relies on *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544 (*Green*) to argue plaintiffs' "temporary parking lot" theory should not be considered by this court.  In *Green*, the Court of Appeal reviewed a judgment of dismissal after a demurrer.  The court held the plaintiffs had forfeited their estoppel claim because they "failed to plead the theory of estoppel and failed to argue that doctrine in the court below, despite the fact that they were allowed to amend their complaint and did, in fact, advance lengthy arguments in opposition to respondents' demurrers."  (*Id.* at p. 555.)  The court explained:  "It is … settled (1) 'that a party to an action may not, for the first time on appeal, change the theory of the cause of action' and (2) 'that issues not raised in the trial court cannot be raised for the first time on appeal.'  [Citation.]  The latter rule especially applies to the doctrine of estoppel which constitutes factual elements which must be both

11.

pled and proved in the trial court." (*Ibid*.) Here, the factual basis for the SAC has not changed.

*Green* has limited relevance here because the issue of a dangerous condition under section 835 is dissimilar from estoppel. Subsequent guidance from our Supreme Court also conflicts with *Green* to the extent it held a new legal theory may not be raised on appeal from dismissal after a demurrer. Specifically, the court stated in *Dinuba*, "we determine de novo whether the complaint states facts sufficient to state a cause of action under *any possible legal theory*. [Citation.] We are not limited to plaintiffs' theory of recovery or 'form of action' pled in testing the sufficiency of the complaint." (*Dinuba*, *supra*, 41 Cal.4th at p. 870, italics added.) This court has concluded that under *Dinuba*, "the 'any possible legal theory' standard encompasses a legal theory presented for the first time in an opening appellant's brief." (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1244–1245.) Accordingly, "an appellate court 'may consider new theories on appeal from the sustaining of a demurrer.' " (*Id.* at p. 1245; see e.g., *Hacala v. Bird Rides, Inc.* (2023) 90 Cal.App.5th 292, 307–309 [the appellate court considered the plaintiff's § 835 claim first raised on appeal].)

Consequently, we conclude plaintiffs are not barred from asserting on appeal their legal theory the City created a dangerous condition of public property by creating a "temporary parking lot" or "temporary waiting area" that funneled vehicles over active railroad tracks.

### 2.     *Traffic over Railroad Tracks*

"Ordinarily, traffic congestion is not a dangerous condition invoking the application of section 835." (*Constantinescu v. Conejo Valley Unified School Dist.* (1993) 16 Cal.App.4th 1466, 1473 (*Constantinescu*).) The allegation of heavy traffic in and of itself is insufficient to allege a dangerous condition. In *Brenner*, the court rejected the theory that high volume and speed of vehicular traffic together with heavy pedestrian use constituted a dangerous condition. In affirming the trial court's sustaining of the

12.

demurrer, the court observed the plaintiff failed to allege some "physical characteristics" or "unusual condition" of the street "made the road unsafe when used by motorists and pedestrians exercising due care." (*Brenner*, *supra*, 113 Cal.App.4th at pp. 440–441.) "Many of the streets and highways of this state are heavily used by motorists and bicyclists alike. However, the heavy use of any given paved road alone does not invoke the application of" section 835. (*Mittenhuber v. City of Redondo Beach* (1983) 142 Cal.App.3d 1, 7.)

Plaintiffs argue this is not about the normal heavy use of a road but rather that the City rerouted traffic in anticipation of a special event and created a waiting area with an "unusual condition" that it was over a railroad crossing. Yet plaintiffs fail to identify any *physical* characteristic of public property that combined with heavy traffic to create a dangerous condition. "To establish a qualifying [dangerous] condition, the plaintiff must point to at least one ' "physical characteristic" ' of the property." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 759 (*Cole*); *Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1070 (*Salas*); *Sun v. City of Oakland* (2008) 166 Cal.App.4th 1177, 1189–1190 [summary judgment affirmed where the plaintiff failed to allege the crossway's configuration or physical characteristics created a substantial risk of injury when used with due care].)

A public entity has been found liable under section 835 for causing heavy traffic that *combined* with other factors to create a dangerous condition. For example, in *Constantinescu*, cited by plaintiffs, the school district converted a bus loading zone into a small lot for parents to pick up their children from an elementary school. Parents usually entered the lot through one entrance, parked at the curb, and sometimes parked at an angle to the curb due to limited space. The curb was next to a five-foot sidewalk and then a grassy area for children to wait with no barriers between the children and cars. A parent's car lurched forward and jumped onto the curb injuring children. (*Constantinescu*, *supra*, 16 Cal.App.4th at p. 1469.) There was evidence the school

13.

district knew the lot was hazardous and had changed the school schedule to dismiss all students at the same time leading to the lot becoming overcrowded and chaotic. (*Id.* at p. 1470.) A jury found the school property was in a dangerous condition. (*Id.* at p. 1471.) On appeal, the court acknowledged traffic does not generally constitute a dangerous condition under section 835 but observed case law has "acknowledged that '[c]ircumstances can be conceived *where an occupier of land could create automobile snarl-ups on his premises* or unleash forces onto public streets the nature of which would require a court to say that injury to third persons was foreseeable and that a duty of care existed and was breached.' " (*Constantinescu*, at p. 1473.) In affirming the judgment for the plaintiff, the court concluded the school district "helped create traffic congestion that was particularly dangerous. It converted a small lot which had been previously used as a bus loading zone into something quite different. This small area became a place where parents in their automobiles converged at the same time to pick up their children after school. With the chaotic traffic conditions that existed under these circumstances, a jury could reasonably conclude this area was dangerous within the meaning of section 830, particularly when a school district is involved." (*Constantinescu*, at pp. 1473–1474.)

*Constantinescu* is distinguishable from this case. The City did not create the railroad crossing. The traffic waiting for the Lane to open was not constricted to a small area like the lot in *Constantinescu* but was instead routed along a public street, Shields Avenue. Though this led to a line of vehicles waiting on Shields Avenue, the SAC contains no allegations queuing vehicles were *forced* to stop on the railroad crossing while waiting. Nothing prevented drivers from staying in the queue but waiting to traverse the railroad crossing until there was enough space to clear the crossing and safely drive behind the vehicle ahead. There is also no allegation the City permitted drivers to leave their vehicles while waiting for the Lane to open, thereby creating an area for vehicles to park. The circumstances alleged here are thus not comparable to *Constantinescu*, in which the school district was liable based on an "amalgam of factors":

14.

the lot's small size; dismissal of all the children from school at the same time causing heavy traffic congestion from parents picking up their children; the lack of barriers between the cars and children; and the school district's awareness the lot was hazardous. (*Constantinescu*, *supra*, 16 Cal.App.4th at p. 1476.)

As evidence the City knew the queuing of vehicles over railroad tracks for the Lane was a dangerous condition, plaintiffs point to a 2019 accident when another vehicle queuing for the Lane was hit by a train at the subject railroad crossing.  A public entity may be liable under section 835 "if it fails to remedy a dangerous condition despite having notice and sufficient time to protect against it." (*Brenner*, *supra*, 113 Cal.App.4th at p. 439.)  The "occurrence or nonoccurrence of prior similar accidents at the same site is ' "relevant to the determination of whether a condition is dangerous." ' " (*Stack v. City of Lemoore* (2023) 91 Cal.App.5th 102, 119.)  However, when evidence of prior accidents is offered to show a dangerous condition, the conditions under which the prior accidents occurred must be "the same or substantially similar to the one in question." (*Salas*, *supra*, 198 Cal.App.4th at p. 1072.)  Here, the record reflects that on December 22, 2019, a driver[6] queuing for the Lane was moving their vehicle slowly along Shields Avenue and crossing the tracks when they saw a train approaching.  The driver believed there was enough room to clear the tracks, but the train collided with the driver's vehicle causing major damage to the vehicle but no injuries.  Though the prior accident was described in pleadings as "nearly identical" to the subject collision, there are limited details in the record showing it occurred under substantially similar conditions beyond the allegation this vehicle was also queuing for the Lane.[7]  Even if the conditions were substantially

---

[6]     The driver's gender is unclear as both gender pronouns were used in pleadings referencing the driver.

[7]     The SAC states a copy of the report from the Fresno Police Department for the 2019 accident was attached as an exhibit.  This report is not included in the record before us.  As the appellants, plaintiffs have the burden of providing an adequate record. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)  "[I]t is a fundamental principle of

15.

similar, one prior accident is not indicative of a dangerous condition given the Lane had reportedly been organized annually for nearly 100 years. (See e.g., *Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 138 (*Mixon*) [only one similar accident during previous eight years did not show the intersection was a dangerous condition considering the volume of traffic].)

In sum, plaintiffs have not identified facts sufficient to show the queuing of vehicles over active railroad tracks presented a substantial risk of injury to drivers who used due care. Even if routing traffic over railroad tracks could present a dangerous condition, plaintiffs have at most identified facts suggesting the subject area could be dangerous for drivers failing to exercise due care when traversing the railroad crossing. This does not constitute a dangerous condition for which the City may be held liable. "[A]ny property can be dangerous if used in a sufficiently improper manner. For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use." (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196.) "The manifest intent of the … Act is to impose liability only when there is a substantial danger which is *not* apparent to those using the property in a reasonably foreseeable manner with due care." (*Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131.) While a plaintiff-user's negligence "has no bearing upon the determination of a 'dangerous condition' in the first instance" (*ibid.*), a "[p]roperty is not 'dangerous' within the meaning of the statutory scheme if the property is safe when used with due care and the risk of harm is created only when foreseeable users fail to exercise due care" (*Brenner*, *supra*, 113 Cal.App.4th at p. 439). Common sense also dictates "premises liability may not be imposed on a public entity when the danger of its property

appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment…. 'Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Id.* at pp. 609–610.)

is readily apparent." (*Biscotti v. Yuba City Unified School Dist.* (2007) 158 Cal.App.4th 554, 560; *Fredette*, at p. 132 [diving from pier into shallow lagoon was not a dangerous condition because the danger would have been obvious to any swimmer].) Railroad tracks are "an open and obvious danger." (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 126; accord, *Will v. Southern Pac. Co.* (1941) 18 Cal.2d 468, 474.) "A railroad crossing is in itself a warning of danger and imposes on an automobile driver, knowingly approaching it, the duty of observing due care for his own safety." (*Kilgore v. Southern Pac. Co.* (1935) 9 Cal.App.2d 506, 508.) A railroad crossing is generally safe to traverse when a driver exercises care not to stop their vehicle on the tracks. The only apparent risk of harm was to drivers who failed to exercise due care when traversing the railroad crossing. The City is not liable for that conduct.

### 3. Failure to Allege Physical Deficiency

In the demurrer and on appeal, the City argues plaintiffs' cause of action for a dangerous condition fails as a matter of law because plaintiffs failed to allege a physical deficiency of public property. Indeed, plaintiffs expressly conceded they were not alleging a physical defect of the property in their response to the City's demurrer. "A plaintiff's allegations, and ultimately the evidence, must establish a *physical* deficiency in the property itself." (*Cerna*, *supra*, 161 Cal.App.4th at p. 1347.) Our independent review of the SAC did not reveal any allegations the railroad crossing or the surrounding area was damaged, deteriorated, or otherwise physically defective.

Plaintiffs argue they need not allege a physical defect of the property because our Supreme Court has explained that "a physical feature" of property, including active railroad tracks in good working condition, can create a dangerous condition. Plaintiffs rely on *Holmes v. City of Oakland* (1968) 260 Cal.App.2d 378 (*Holmes*), noting the Supreme Court in *Bonanno* cited *Holmes* with approval. Plaintiffs' reliance on *Holmes*, and by extension *Bonanno*, is misplaced.

17.

In *Holmes*, the plaintiff child was run over by a railroad train running on a right-of-way along a city street. The plaintiff alleged the street was in a dangerous condition because the tracks were near a grammar school, many of the school's students crossed the tracks on their way home, and the children were attracted to the trains and railroad cars. (*Holmes*, *supra*, 260 Cal.App.2d at p. 381.) The Court of Appeal concluded the city "could reasonably foresee that children would be attracted to trains and railroad cars operating over and upon [the city street], and that children might be injured if reasonable precautions were not taken to protect them from that risk." (*Id.* at p. 388.) The court held that although the city did not own or control the right-of-way, the public street was in a dangerous condition because of its adjacency to "unguarded railroad tracks." (*Id.* at pp. 389, 391.) Accordingly, the city's potential liability for a dangerous condition of public property in *Holmes* was based on the location of the railroad tracks and its vicinity to a public street. (*Bonanno*, *supra*, 30 Cal.4th at p. 149 [the dangerous condition in *Holmes* "was the adjacency of the street and the railroad right-of-way"].)

The *Bonanno* court addressed whether a bus stop's location may be considered a dangerous condition of public property because the stop's location *required* bus users to cross a dangerous crosswalk to reach it. (*Bonanno*, *supra*, 30 Cal.4th at p. 147.) The court observed a dangerous condition most obviously exists "when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself." (*Id.* at p. 148.) But the court further observed "public property has also been considered to be in a dangerous condition 'because of the design or *location* of the improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use.' " (*Id.* at p. 149.) In this vein, the court cited *Holmes* as an example "that hazards present on adjoining property may create a dangerous condition of public property when users of the public property are necessarily exposed to those risks." (*Bonanno*, at p. 149.) The court consequently rejected the argument the public transit authority (CCCTA) could not be liable for an

18.

injury occurring on property (the street) it did not own or control. (*Id.* at p. 151.) Because CCCTA owned and controlled its own bus stop, and "caused users of the bus stop to be at risk from the immediately adjacent property," CCCTA could be found liable for a dangerous condition under section 835. (*Bonanno*, at p. 151.)

*Holmes* and *Bonanno* stand for the legal principle that "a dangerous condition may arise from the *location* of public property or 'its relationship to its surroundings' [citation] including its 'adjacency' to property on which an injury-producing condition exists." (*Cole*, *supra*, 205 Cal.App.4th at pp. 760–761.) The SAC contained no allegations regarding the physical location of a public roadway or its relationship to the railroad crossing. The railroad crossing was not alleged to be enticing to nearby (and vulnerable) users of public property like in *Holmes*. The SAC did not allege facts drivers were forced to encounter a dangerous condition to traverse the railroad crossing like the bus users in *Bonanno* because, as discussed above, the crossing was not shown to pose a danger to drivers exercising due care. The other cases cited by plaintiffs where a public entity was potentially liable for a dangerous condition of public property based on the location or a physical feature of the property are similarly inapposite. (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 812–815 [community college district may be liable for failure to trim thick and untrimmed foliage or take protective measures which created a reasonably foreseeable risk of criminal assault on students]; *Branzel v. City of Concord* (1966) 247 Cal.App.2d 68, 73–75 [jury could reasonably find the city's model airplane flying field created a dangerous condition due to its adjacency to high voltage power lines]; *Bauman v. City and County of San Francisco* (1940) 42 Cal.App.2d 144, 153 [playground was dangerous based on its proximity to a baseball field]; *Hawk v. City of Newport Beach* (1956) 46 Cal.2d 213, 216–217 [whether a rock constituted a dangerous condition could not be decided as a matter of law where reasonable minds could differ on whether the city took reasonable precautions to protect the public from the dangers of diving off the rock].)

Plaintiffs also rely on *Mangiarancia v. BNSF Railroad Company* (N.D. Cal. Mar. 7, 2019, No. 16-cv-05270-JST) 2019 WL 1975461, an unpublished federal district court case. This case is not binding on this court and is also distinguishable. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [California appellate courts are not bound by decisions of the lower federal courts].) In *Mangiarancia*, the plaintiff driver was seriously injured when his truck was struck by an Amtrak train. The railroad crossing had no active warning signs and there had been multiple collisions at the crossing over a 12-year period. (*Mangiarancia*, at p. *1.) Contra Costa County had closed off part of a road near the crossing for a construction project and created a temporary access road. (*Id.* at p. *2.) In denying the County's motion for summary judgment for a dangerous condition under section 835, the court concluded "[a] jury could reasonably infer that the County heightened the potential for accidents by allowing large numbers of vehicles to park … in close proximity to the Crossing, without any established turnaround or exit points." (*Mangiarancia*, at p. *44.) The court cited the additional conditions that the crossing was historically known to be dangerous and lacked active warning devices, and construction noise may have made it more difficult to hear approaching trains. (*Ibid.*) As discussed above, plaintiffs did not allege sufficient facts the City created a temporary parking lot for queuing vehicles or constricted vehicles in a way that required stopping on the railroad crossing. The crossing was not known to be dangerous and, as will be discussed below, the additional alleged factors did not increase the crossing's danger. *Mangiarancia* is thus inapposite.

### 4. Other Allegations

The SAC also alleged the City created a dangerous condition on Lane drive nights by failing to provide proper and adequate signage, lighting, highway markings, warnings and/or protective barriers, and crossing guards at the railway crossing. We turn now to whether these facts sufficiently allege a dangerous condition of public property as defined by section 830.

20.

As the City argued in its demurrer, the lack of signage does not create a dangerous condition of public property. The Legislature has expressly provided that a "condition is not a dangerous condition … merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code." (§ 830.4.) "Thus, the statutory scheme precludes a plaintiff from imposing liability on a public entity for creating a dangerous condition merely because it did not install the described traffic control devices." (*Brenner*, *supra*, 113 Cal.App.4th at p. 439.)

Plaintiffs argue section 830.4 is not applicable because they do not allege the City was liable for merely failure to provide traffic control signals. Rather, plaintiffs contend the City affirmatively put the public at risk by creating a new traffic pattern that routed cars to sit over railroad tracks. We have already rejected plaintiffs' routing of traffic theory of liability as lacking sufficient allegations the City created a dangerous condition of public property. We acknowledge however a public entity may "be liable where a dangerous condition 'exists for reasons *other than or in addition to* the "mere[ ]" failure to provide [traffic] controls or markings.' " (*Mixon*, *supra*, 207 Cal.App.4th at p. 135.) For example, a public entity was found liable as a dangerous condition of public property under section 835 where the failure to provide regulatory traffic signals combined with metal pillars and shadows to visually obstruct motorists at an intersection. (*Washington v. City and County of San Francisco* (1990) 219 Cal.App.3d 1531, 1537–1538.) As found in *Constantinescu*, a dangerous condition of public property may be based on an amalgam of factors. However, if each of several factors "has a zero danger factor, it cannot be said that any alchemist's process will create one for the whole." (*Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 484 (*Antenor*).) Whether considered individually or collectively, the identified factors in the SAC do not sufficiently allege the existence of a dangerous condition.

First, the SAC did not allege the subject railroad crossing did not have the required railroad warning approach signs (e.g., Veh. Code, § 21362) and nothing in the record indicates the crossing required additional signage to alert drivers to its presence. A dangerous condition of a public street that is a concealed trap may require posting a warning sign to alert drivers to the danger. (*Mixon*, *supra*, 207 Cal.App.4th at pp. 135–136.) A concealed dangerous condition "would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." (§ 830.8; *Tansavatdi*, *supra*, 14 Cal.5th at p. 654.) Plaintiffs made no allegations the railroad crossing was obscured by a blind corner, foliage, or some other visual obstruction. (E.g., *Brenner*, *supra*, 113 Cal.App.4th at pp. 440–441 [conditions that increase the danger of a road include "blind corners, obscured sightlines, elevation variances, or any other unusual condition that made the road unsafe when used by motorists and pedestrians exercising due care"].) On the contrary, the SAC included a photograph of backed up traffic east of the accident location reflecting signs for the railroad crossing were visible at night from distance.

Second, the City's failure to provide lighting is not actionable because "[a] public entity is under no duty to light its streets. [Citation.] … A duty to light, 'and the consequent liability for failure to do so,' may arise only if there is 'some peculiar condition rendering lighting necessary in order to make the streets safe for travel.' [Citation.] In other words, a prior dangerous condition may require street lighting or other means to lessen the danger but the absence of street lighting is itself not a dangerous condition." (*Mixon*, *supra*, 207 Cal.App.4th at p. 133; accord, *Antenor*, *supra*, 174 Cal.App.3d at p. 483.) Plaintiffs assert no facts regarding how lighting near the railroad crossing was inadequate and we discern none from the record.

Third, plaintiffs cannot support their claim based on a lack of crossing guards at the railroad crossing because the failure to provide crossing guards does not constitute a dangerous condition of *property*. "The presence or absence of crossing guards is not a physical characteristic of the [property] and thus not actionable as a dangerous condition.

22.

A lack of human supervision and protection is not a deficiency in the physical characteristics of public property. … [C]rossing guards provide essentially a police function in providing traffic control and enforcement of traffic laws." (*Cerna*, *supra*, 161 Cal.App.4th at p. 1352.) Public entities are immune from liability for failure to provide security services or police presence. (§ 845; *Zelig*, *supra*, 27 Cal.4th at pp. 1131–1136 [lack of police screening at courthouse is not a dangerous condition of public property].) If the failure to provide crossing guards at an intersection near a school did not constitute a dangerous condition in *Cerna*, then it likewise does not here.

Lastly, we reject the allegation the City was liable for failure to provide protective barriers. Under certain circumstances, a public entity may be obligated to erect physical barriers to protect against a danger on its property. (E.g., *Constantinescu*, *supra*, 16 Cal.App.4th at pp. 1474–1475.) But where the public property has no defect or dangerous physical characteristic, a public entity is generally not required to erect barriers. (*Zelig*, *supra*, 27 Cal.4th at pp. 1137–1140, 1146; cf. *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789, 806–808 [the city knew vehicles were driving onto a public beach and failed to erect barriers to protect foreseeable beach users from that danger].) Additionally, the failure to erect barriers cannot be a basis for liability under section 835 where "the absence of barriers did not increase or intensify the risk of injury." (*Avedon v. State of California* (2010) 186 Cal.App.4th 1336, 1342.) We have already concluded plaintiffs failed to allege a physical characteristic or defect of public property that was dangerous. As previously discussed, even if railroad tracks are an obvious danger, a railroad crossing is typically safe to traverse when drivers exercise due care. It is unclear what barriers would have accomplished here or how their absence increased or intensified any risk of injury. (See *Zelig*, at pp. 1137–1139 [lack of barriers at courthouse would not have any effect on the risk of a shooting in the courthouse].)

In conclusion, the City's demurrer was properly sustained because plaintiffs failed to allege facts sufficient to state a cause of action for a dangerous condition of public property under section 835.

## III.    MANDATORY DUTY

Section 815.6 provides that "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  A claim under section 815.6 "has three elements that must be satisfied to impose public entity liability:  (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of the mandatory statutory duty proximately caused the injury."  (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179.)

An "enactment" is defined as "a constitutional provision, statute, charter provision, ordinance or regulation."  (§ 810.6.)  " 'This definition is intended to refer to all measures of a formal legislative or quasi-legislative nature.' "  (*Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 982.)  The term "regulation" as used in section 810.6 means "a rule, regulation, order or standard, having the force of law, adopted … as a regulation by an agency of the state pursuant to the Administrative Procedure Act."  (§ 811.6.)  "[A]pplication of section 815.6 requires that the enactment at issue be *obligatory,* rather than merely discretionary or permissive, in its directions to the public entity; it must *require,* rather than merely authorize or permit, that a particular action be taken or not taken."  (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498 (*Haggis*).)  Whether an enactment creates a mandatory duty is a question of law.  (*Id.* at p. 499.)

On appeal, plaintiffs rely on portions of the 2014 edition of the California Manual on Uniform Traffic Control Devices (MUTCD) to argue the City breached a mandatory duty to not create conditions where vehicles can be queued across railroad tracks.[8] The MUTCD states it "is published by the State of California, Caltrans and is issued to adopt uniform standards and specifications for all official traffic control devices in California, in accordance with Section 21400 of the California Vehicle Code (CVC)." The MUTCD provides guidelines for the creation of a temporary traffic control (TTC) zone or "TTC zone," defined as "an area of a highway where road user conditions are changed because of a work zone, an incident zone, or a planned special event through the use of TTC devices, uniformed law enforcement officers, or other authorized personnel." According to the MUTCD, "[a] planned special event often creates the need to establish altered traffic patterns to handle the increased traffic volumes generated by the event. The size of the TTC zone associated with a planned special event can be small, such as closing a street for a festival, or can extend throughout a municipality for larger events. The duration of the TTC zone is determined by the duration of the planned special event." Section 6G.18 of the MUTCD provides a "Standard" for work in the vicinity of a grade crossing[9] and states: "When grade crossings exist either within or in the vicinity of a TTC zone, lane restrictions, flagging, or other operations *shall not create conditions where vehicles can be queued across the tracks.* If the queuing of vehicles across the tracks cannot be avoided, a uniformed law enforcement officer or flagger shall be

---

[8] The SAC alleged the City breached a mandatory duty under article 24 of the Fresno Code of Ordinances by failing to require Fig Garden obtain a special event permit or create a traffic control plan for the Lane. Plaintiffs appear to abandon this theory on appeal, and we therefore do not address it.

[9] According to plaintiffs, the MUTCD defines a "grade crossing" as "the general area where a highway and a railroad and/or light rail transit route cross at the same level, within which are included the tracks, highway, and traffic control devices for traffic traversing that area."

provided at the crossing to prevent vehicles from stopping on the tracks, even if automatic warning devices are in place." (Italics added.) Plaintiffs argue the MUTCD's use of the term "shall not" in section 6G.18 creates a mandatory duty that a particular action not be taken and the City therefore had a mandatory duty not to create these conditions. They further contend the City breached a mandatory duty by failing to provide a uniformed law enforcement officer or flagger at the crossing where the queuing of vehicles across the tracks cannot be avoided. Plaintiffs claim many courts have recognized the MUTCD creates mandatory duties at least with respect to its standards and cites several out-of-state cases, as well as a California superior court case and an unpublished federal district court case.

None of the cases cited by plaintiffs are binding on this court. Moreover, "[a] plaintiff asserting liability under … section 815.6 'must specifically allege the applicable statute or regulation.' " (*Brenneman v. State of California* (1989) 208 Cal.App.3d 812, 817 (*Brenneman*).) Conspicuously absent from plaintiffs' contentions is citation to any statute, ordinance, or regulation requiring the City to abide by the guidelines in the MUTCD. Plaintiffs do not allege the MUTCD is the product of a law passed by the Legislature or was adopted pursuant to the Administrative Procedure Act. It is a manual, not an enactment or regulation, and does not impose mandatory duties on the City. (See *Searcy v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 801 [School Area Pedestrian Safety manual on traffic control guidelines did not impose mandatory duties on the school district]; *Posey v. State of California* (1986) 180 Cal.App.3d 836, 848–850 [internal guideline was not adopted by the CHP pursuant to the Administrative Procedure Act and thus did not create a mandatory duty to inspect and remove vehicles parked on the side of the highway].)

Even if we treat the MUTCD as an enactment, "[a] mandatory duty is created only when an enactment requires an act that is clearly defined and not left to the public entity's discretion or judgment … When the enactment leaves implementation to an exercise of

discretion, 'lend[ing] itself to a normative or qualitative debate over whether [the duty] was adequately fulfilled,' an alleged failure in implementation will not give rise to liability." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 350; *Guzman*, *supra*, 46 Cal.4th at p. 908 [county had no mandatory duty to act where regulations clearly called for county's exercise of discretion].) Accordingly, for purposes of liability under section 815.6, it is not enough "that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion." (*Haggis*, *supra*, 22 Cal.4th at p. 498.)

Here, parts of the MUTCD cited by plaintiffs state in relevant part: "The Standard, Guidance, Option, and Support material described in this edition of the MUTCD provide the transportation professional with the information needed to make appropriate decisions regarding the use of traffic control devices on streets, highways, bikeways and private roads open to public travel." "Engineering judgment must be used to apply these guidelines to the typical or example applications [of traffic control devices], or adjust them to fit individual field site conditions. The California MUTCD is not intended to be a substitute for engineering knowledge, experience or judgment." This language suggests there remained an exercise of discretion in applying the MUTCD guidelines. Such discretionary language is inconsistent with a mandatory duty. (E.g., *Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848, 861–863 [U.S. Army Corps of Engineers' manual did not create a mandatory duty under § 815.6 given manual's language it was not intended to replace engineers' judgment]; *Brenneman*, *supra*, 208 Cal.App.3d at p. 818 [parole procedures manual did not impose mandatory duties where the manual left considerable discretion to the state in deciding how to supervise a parolee].) Consequently, plaintiffs fail to allege facts sufficient for a cause of action against the City for breach of a mandatory duty under section 815.6.

## IV.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

"Negligent infliction of emotional distress ' "is not an independent tort, but the tort of *negligence*," ' to which ' "traditional elements of duty, breach of duty, causation, and damages apply." ' " (*Downey v. City of Riverside* (2024) 16 Cal.5th 539, 547 (*Downey*).) As previously discussed, public entities are immune from general tort liability for injury except as provided by statute.  (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899 [§ 815 "abolishes common law tort liability for public entities"].) "[D]irect tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714."  (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1183.)

Plaintiffs contend they may bring a negligent infliction of emotional distress claim against the City based on either their claim for a dangerous condition of public property (§ 835) or breach of a mandatory duty (§ 815.6).  However, we have concluded the City's demurrer to both those claims was properly sustained.  Essentially, there can be no liability for plaintiffs' emotional distress if the City cannot be held liable under either section 835 or 815.6.  In the absence of a statutory basis for the City's liability, plaintiffs' emotional distress claim is not independently viable.

Plaintiffs' reliance on *Downey* is misplaced.  In *Downey*, the plaintiff mother was giving directions to her daughter on a cell phone when her daughter was severely injured in a car crash.  The plaintiff heard the accident and its aftermath but did not see what caused it.  She sued individuals and entities including the city for negligent infliction of emotional distress.  (*Downey*, *supra*, 16 Cal.5th at p. 544.)  The city was alleged to be liable because deficient "traffic markings, signals, warnings, medians, and fixtures" constituted a dangerous condition of public property under section 835.  (*Downey*, at p. 545.)  The sole question before the Supreme Court was whether a bystander pursuing a negligent infliction of emotional distress claim "must understand not only that a close

28.

relative is suffering injury, but also that the defendant's negligent conduct or omissions have caused the injury." (*Id.* at p. 551.)[10] The court expressly deemed "beyond the scope of" its opinion whether the plaintiff could prove all the elements of her negligence claim against the city. (*Downey*, at p. 551, fn. 5.) At no point did the court consider, let alone conclude, that a negligent infliction of emotional distress claim may be pled against a public entity without an underpinning statutory basis for liability.

*Zuniga v. Housing Authority* (1995) 41 Cal.App.4th 82, also relied on by plaintiffs, likewise does not assist them. In that case, tenants in a public housing facility were killed in an arson fire. (*Id.* at p. 90.) The surviving family members alleged a dangerous condition of public property based on the housing authority's inadequate security measures to protect against drug dealers who congregated outside the victims' unit. (*Id.* at p. 93.) The Court of Appeal determined the plaintiffs sufficiently alleged a dangerous condition and overruled the order granting the housing authority's demurrer which permitted the plaintiffs to pursue their negligent infliction of emotional distress claim. (*Id.* at pp. 93–94.) As in *Downey*, the *Zuniga* court did not conclude the plaintiffs' emotional distress claim was independently viable against the housing authority without a statutory basis for liability. Rather, the emotional distress claim remained viable because the section 835 claim was still viable.[11] That is not the case here.

This is unquestionably a tragic case, and we are sympathetic to plaintiffs for the loss of Anton at just five years of age, as well as the serious injuries sustained by the

---

[10] A negligent infliction of emotional distress claim may be based on a bystander theory of liability. (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1071.) "[B]ystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another." (*Id.* at p. 1073.)

[11] We also note the *Zelig* court heavily criticized and abrogated *Zuniga*. (*Zelig*, *supra*, 27 Cal.4th at pp. 1137–1139, 1145–1146.)

surviving plaintiffs. We are however constrained by the law to hold the trial court properly sustained the City's demurrer because plaintiffs failed to allege facts sufficient to state a cause of action against the City.

## V.    LEAVE TO AMEND

When a demurrer is sustained without leave to amend, we review the denial of leave to amend for abuse of discretion. (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958.) "If there is a reasonable possibility that the defect in a complaint can be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.) "The appellant has the burden to identify specific facts showing the complaint can be amended to state a viable cause of action. [Citation.] An appellant can meet this burden by identifying new facts or theories on appeal." (*Minnick v. Automotive Creations, Inc.* (2017) 13 Cal.App.5th 1000, 1004; *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 748; Code Civ. Proc., § 472c, subd. (a).)

In plaintiffs' opposition to the demurrer, they requested leave to amend but did not identify any new facts or theories they could allege to cure the deficiencies in the SAC's allegations. At the hearing on the trial court's tentative ruling, plaintiffs did not specify how the SAC could be amended. Plaintiffs represented to this court during oral argument that they had no opportunity to explain to the trial court how the complaint could be amended because the focus was on the court's application of a purportedly incorrect standard.

On appeal, plaintiffs maintain the SAC can be amended to state causes of action against the City for a dangerous condition of public property and breach of a mandatory duty. In their reply brief, plaintiffs propose to amend the complaint to make the following facts explicit: (1) traffic conditions were altered by the City between 5:00 and 6:00 p.m. on December 1, 2020, in anticipation of the Lane opening at 6:00 p.m.; (2) the City prevented cars from entering the Lane before 6:00 p.m. which turned the road into a

waiting area for cars; and (3) northbound Van Ness becomes a one-way street at 6:00 p.m. but traffic conditions were altered at 5:00 p.m. when the City prevented traffic from entering the Lane forcing cars to stop in a bumper-to-bumper queue that extended over active railroad tracks.**12** Plaintiffs further claim the complaint can be amended to allege violation of the mandatory duty in section 6G.18 of the MUTCD and the TTC zone began before plaintiffs' injury.

"Ordinarily, an appellant who seeks leave to amend attempts to show that the trial court's denial of leave to amend was error by showing on appeal what facts could be pleaded to cure defects in the complaint and how they state a cause of action. [Citation.] But for an original complaint, regardless whether the plaintiff has requested leave to amend, it has long been the rule that a trial court's denial of leave to amend constitutes an abuse of discretion unless the complaint 'shows on its face that it is incapable of amendment.' " (*Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 411.)  While the complaint before us is not the original complaint, no previous demurrer had challenged plaintiffs' allegations.  Based on the procedural history, the City's demurrer was the first time plaintiffs' theories and facts had been legally tested.  Fairness dictates we treat the SAC as an original complaint and conclude "there is no reason in law or fairness to deny [plaintiffs] an opportunity at least to amend the causes of action against [the City]." (*Id.* at p. 413; see also *Tarrar Enterprises, Inc. v. Associated Indemnity Corp.* (2022) 83 Cal.App.5th 685, 688–689; *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1227 ["Liberality in permitting amendment is the rule, if a fair

---

**12**      Plaintiffs also assert the complaint could be amended to specifically reference section 835.  Though a plaintiff alleging a tort claim against a public entity must identify the specific statute establishing a duty (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 638), the City and the trial court clearly understood plaintiffs were relying on section 835.  Nonetheless, we agree plaintiffs should cite section 835 if they assert a cause of action for a dangerous condition of public property in their third amended complaint.

opportunity to correct any defect has not been given."].)  This is consistent with Supreme Court precedent holding in relevant part:  "If the plaintiff has not had an opportunity to amend the complaint in response to the demurrer, leave to amend is liberally allowed as a matter of fairness, unless the complaint shows on its face that it is incapable of amendment."  (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747.)  "[L]eave to amend is properly granted where resolution of the legal issues does not foreclose the possibility that the plaintiff may supply necessary factual allegations."  (*Ibid.*)  Nothing in the SAC or the proposed additional facts indicates there is no reasonable possibility plaintiffs will be unable to supply the necessary factual allegations to state a claim against the City for a dangerous condition of public property or breach of a mandatory duty.  Though plaintiffs may ultimately fail to state a cause of action, because plaintiffs have not previously had an opportunity to respond to the identified defects in their complaint, they must be allowed to amend the SAC.

We emphasize our determination on the propriety of the order sustaining the demurrer does not preclude plaintiffs from including some or all the same factual and legal allegations previously made together with additional allegations in an amended complaint.  Nothing in this opinion should be construed as foreclosing plaintiffs from raising similar theories of recovery with additional facts in a complaint filed after remand.[13]  (See e.g., *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 803 [demurrer properly sustained without leave to amend but nothing precluded plaintiff from seeking leave to amend with the same cause of action based on other facts or theories].)

---

[13]    This applies equally to both plaintiffs' claims, but we particularly stress that our finding the language in the MUTCD indicated discretion inconsistent with a mandatory duty is not dispositive on the question of whether the MUTCD created a mandatory duty on the City's part.

## DISPOSITION

The judgment is reversed.  The trial court shall vacate its order sustaining the City's demurrer without leave to amend and enter a new order sustaining the demurrer with leave to amend.  Plaintiffs shall recover their costs on appeal.

FRANSON, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.